IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DEREK LEE WHITE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-01281 |
| | ) | |
| DEBRA JOHNSON, Warden, | ) | Judge Campbell |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Derek Lee White, a state prisoner incarcerated at the Turney Center Industrial Complex in Only, Tennessee, has filed a *pro se* petition under 28 U.S.C. § 2254 for the writ of habeas corpus. (ECF No. 1.) The respondent has submitted an answer in opposition to the petition, along with a complete copy of the underlying state-court record. The petition is ripe for review. For the reasons set forth herein, petition will be denied and this action dismissed with prejudice.

## I.     PROCEDURAL BACKGROUND

On July 20, 2011, the petitioner pleaded guilty in the Davidson County Criminal Court to charges of second-degree murder, attempted first-degree murder, and especially aggravated robbery (two counts). (*See* ECF No. 13-2 (Plea Hr'g Tr.).) He was sentenced to an agreed prison term of 30 years, to be served at 100%. (*See* ECF No. 13-1, at 12 (Plea Pet.); ECF No. 13-1, at 19–22 (corrected Judgments).) More specifically, he agreed to waive his sentencing range with respect to the second-degree murder charge and was sentenced to 30 years at 100% on that count. (ECF No. 13-1, at 19.) He was sentenced to 15 years on each of the three remaining counts, all to be served concurrently with the 30-year sentence. He received pretrial jail credit from November 12, 2009 through the date of sentencing. The petitioner did not pursue a direct appeal. Pursuant to Tennessee law, the convictions became final 30 days later, on August 19, 2011.

The petitioner filed a *pro se* petition and lengthy supporting memorandum in the state court for post-conviction relief on April 23, 2012. (ECF No. 13-1, at 23–32, 33–65.) The court appointed counsel, who filed an amended petition. (ECF No. 13-1, at 81–83.) The trial court conducted a hearing (*see* ECF No. 13-3 (Post-Conviction Hr'g Tr.)) and denied the petition on October 8, 2012. (ECF No. 13-1, at 85–91 (Order).) That

decision was affirmed on appeal. *White v. State*, No. M2012-02377-CCA-R3-PC, 2013 WL 4487607 (Tenn. Ct. Crim. App. Aug. 21, 2013), *perm. appeal denied* (Tenn. Apr. 10, 2014).

Petitioner White filed his petition under 28 U.S.C. § 2254 in this Court on June 9, 2014. The respondent has filed an answer along with a complete copy of the underlying state-court record. The petition is timely, and this Court has jurisdiction.

## II.     PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING

The petitioner requests an evidentiary hearing. Rule 8(a) of the Rules Governing § 2254 Cases states in pertinent part: "If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rules Gov'g § 2254 Cases, Rule 8(a), 28 U.S.C. foll. § 2254. When deciding whether to grant an evidentiary hearing, "a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the petitioner to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate." *Id.* If the record refutes the habeas petitioner's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing. *Id.* If a habeas petitioner has failed to develop the factual basis for his claim in state court, the district court is precluded from granting an evidentiary hearing unless the petitioner establishes that the claim relies on a new, retroactive rule of constitutional law or a factual predicate that could not have been discovered except by due diligence. 28 U.S.C. § 2254(e)(2); *Robinson v. Howes*, 663 F.3d 819, 823–24 (6th Cir. 2011). A habeas petitioner is not entitled to an evidentiary hearing on his claims if they lack merit. *See Stanford v. Parker*, 266 F.3d 442, 459–60 (6th Cir. 2001); *see also Cullen v. Pinholster*, 563 U.S. ----, 131 S. Ct. 1388, 1398 (2011) (holding that habeas review under section 2254(d) is "limited to the record that was before the state court.").

Because, as set forth herein, the record clearly establishes that the petitioner is not entitled to relief, the Court will deny his request for an evidentiary hearing.

## III.     STATEMENT OF FACTS

The Tennessee Court of Criminal Appeals summarized the testimony presented at the plea

submission and in the post-conviction hearing as follows:[1]

This case arises from the shooting of two men, which occurred during a drug transaction. . . .

At the guilty plea submission hearing the Petitioner . . . testified that he had discussed his case with his attorney ("Counsel") and was satisfied with Counsel's performance. He confirmed that there was no further investigation of issues or witnesses needed. In addition, he said his plea was voluntary, and he had not been induced to enter a guilty plea by any promise or threat of force.

The State then provided the following recitation of facts [to which Petitioner stipulated] in support of the Petitioner's plea:

[The] State's proof would have shown that on November 11th, 2009 [the Petitioner] and Michael S[c]hamberg had communicated on the telephone and agreed to meet up. They knew each other from a college class where they had become friends and Michael S[c]hamberg had on a number of occasions sold marijuana to [the Petitioner].

In the past, sometimes Mr. S[c]hamberg would provide the marijuana to [the Petitioner] and he would allow for [the Petitioner] to give him the money back when he could repay him. That had happened at one point in the past and [the Petitioner] owed a couple of hundred dollars to Michael S[c]hamberg. When Michael S[c]hamberg received the phone call, [the Petitioner] told him that he had the money to repay him and additionally, [the Petitioner] wanted to purchase two more ounces of marijuana. The ounces of marijuana were to be for $400 each, so a total of $1,000 was to be brought by [the Petitioner] when he met Michael S[c]hamberg.

After a number of phone calls between the two, they agreed to meet up at the Quick Sac store in Antioch on Sleepy Hallow [sic]. And prior to going over to that location, Michael S[c]hamberg went and picked up Ryan Wright. Mr. Wright and Mr. S[c]hamberg rode over to that location in Mr. S[c]hamberg's Tahoe and meanwhile, [the Petitioner] had arrived at the location in a dark-colored Impala with his brother Brandon White with him and an additional person who has never been identified.

[The Petitioner] got into the front seat of Mr. S[c]hamberg's Tahoe. Mr. Brandon White got into the rear drivers' side. Ryan W[right] had gone from the front seat and was sitting in the backseat. All four of them drove away from the location and at first [the Petitioner] was trying to get Michael S [c]hamberg to drive down a road that was sparsely populated. Mr. S[c]hamberg declined to do that and was driving around the neighborhood in the area.

And at [that] point in time, Mr. S[c]hamberg showed [the Petitioner] a small bag of marijuana, he had the larger amount of marijuana . . . underneath the cup holders in the console of his Tahoe. At that time, [the

---

[1] The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Petitioner] agreed that he would purchase that marijuana and handed a stack of money to Michael S [c]hamberg. Mr. S[c]hamberg could feel from the weight or the size of the stack of money that it was not the amount of money that it should have been, and he handed it back to Ryan Wright in the backseat asking Ryan to count the money.

They were still driving through the neighborhood at this point in time and the next time Mr. S[c]hamberg looked back, he saw Brandon White holding a gun to Ryan W[right]. He saw Brandon White hit Ryan Wright very hard on the side of his head. He was hit so hard that it immediately began bleeding. And at that point in time, Michael S[c]hamberg pulled the car over and started getting out of the car. [The Petitioner] got out of the front seat and came around to the driver's side. Brandon White got out of the car and pulled Ryan Wright across the backseat. . . .

Brandon White was going through Ryan Wright's pockets. At that point in time, Ryan W[right] had a handgun carry permit and did have his handgun in his pocket. Mr. S[c]hamberg also had a gun with him in the side of the seat. At the time, he looked back and saw Brandon White holding the gun to Ryan Wright, he turned around and saw [the Petitioner] grab his gun. So at this point in time, [the Petitioner] put away his own gun, had Michael S[c]hamberg's gun and Brandon White had taken Ryan Wright's gun away from him.

All four parties were standing outside of the doors of the Tahoe and [the Petitioner] and Brandon White each had guns pointed at Mr. S[c]hamberg and at Ryan Wright. There were a number of items taken in addition to the gun taken from Ryan Wright, the money that he had been counting for Michael S[c]hamberg was taken. At some point in time, the additional two ounces of marijuana were taken from the car. [The Petitioner] also forced Mr. S[c]hamberg to empty out [ ] his pockets and got an additional couple of hundred dollars repeatedly telling him not to do anything stupid. And [the Petitioner] then told Mr. S [c]hamberg to take his pants off. And at that point in time, Mr. S[c]hamberg began to comply with that demand. And the next thing he knew, he heard gunshots. He felt himself get hit with a bullet, and the next shot he heard he saw Ryan Wright drop in the street.

Larissa and Gene Spears were neighbors that lived on Ritchen (phonetic), and as soon as they heard the gunshots, they both went after—well Ms. Spears went outside and went immediately over to Ryan Wright. At that point in time, she tried to render some aid to him and it was—he was not conscious at that point in time, but was breathing shallowly. She called 911 for him.

When Mr. Spears came out, he went over and spoke with Michael S[c]hamberg and Michael S[c]hamberg told him—said the [Petitioner's] name [ ], he said [the Petitioner] shot me. At that point in time, Mr. S[c]hamberg didn't know which of the two fired the gun, he didn't see the gun be fired, but he was announcing the name of the person he knew. Before that day, he had never met Brandon White.

As other neighbors began coming out of the neighborhood—right after the shots were fired, both [the Petitioner] and Brandon White ran and got into the dark-colored Impala that had dropped them off at the Quick Sac.

-4-

That Impala went down—took a left-hand turn and went down the street, ended up being a dead end street so it quickly turned around. Was observed [b]y Mr. Tom Phillips who lived in that neighborhood. The car then quickly sped away from that location.

. . . .

The ambulance and the fire department and police arrived. . . . They took Ryan Wright to Vanderbilt Hospital. A number of police officers talked to Michael S[c]hamberg, and everyone that Mr. S[c]hamberg spoke to that day, [he] told that [the Petitioner] was involved in what had happened.

Mr. S[c]hamberg also then went immediately to the hospital where he had emergency surgery performed on him. He suffered a severed intestine. They had to remove a portion of his intestines and [he] was in the hospital for a number of days. Ryan Wright was pronounced dead upon his arrival at the hospital. He had been shot one time, it went through his body and the bullet was lodged in his spine. It was recovered by the medical examiner.

Police at the scene conducted the investigation, they recovered three shell casings that were consistent with the caliber of bullets that were removed from Mr. Wright and Mr. S[c]hamberg. It was a .45 caliber gun. They also collected a number of items of other evidence at the scene, one of them being a pair of what appeared to be headphones for like a shooting rang[e], ear protection piece. They processed that and a number of other items and when that ear piece was processed, a fingerprint[] belonging to Brandon White was identified on that. When police arrived at the scene, that ear piece was just under the side of the left-hand side of the Tahoe where all of this took place.

The Petitioner entered a plea of guilty, and the trial court sentenced the Petitioner to serve an effective thirty-year sentence in the Tennessee Department of Correction.

. . . .

The Petitioner timely filed a post-conviction petition claiming that he had received ineffective assistance of counsel related to his guilty pleas. At the hearing on the petition, the parties presented the following evidence: The Petitioner testified that his attorney ("Counsel") was appointed to represent him in criminal court on these charges. He said that, during Counsel's two-year representation of the Petitioner, Counsel came to the Criminal Justice Center twice to meet with him and that the two also met twice while he was in the custody of the Tennessee Department of Correction ("TDOC") to "sign for my time." The Petitioner said that Counsel brought discovery materials during one or more of these visits and reviewed it with him.

The Petitioner testified that, shortly after his arrest, his mother provided Counsel with a recorded confession from his "charge partner," the Petitioner's brother. The Petitioner did not know whether Counsel ever showed the confession to the State. The Petitioner also requested that Counsel hire an investigator to follow the victim, Michael Schamberg. He alleged that Schamberg continued to illegally sell drugs. He believed that this information could be used to attack Schamberg's credibility as the State's witness at trial. The Petitioner agreed that Schamberg testified at the preliminary hearing and bond hearing that the shooting occurred during a "marijuana deal." The Petitioner maintained that Schamberg's involvement in selling illegal drugs since the shooting would discredit Schamberg's testimony.

The Petitioner testified that Counsel never discussed a motion to suppress or any type of trial strategy with him. He said that Counsel told him that he potentially faced two life sentences plus seventy-five years. Counsel advised him that the trial court judge was "known for giving [] the max amount of time and stacking [the] sentences." The Petitioner explained that the source of the two life sentences, to which Counsel referred, were the charges for the felony murder of Ryan Wright and the first degree murder of Ryan Wright. The Petitioner said that Counsel never explained that the State would have to elect between the offenses against the same victim and only told him that he would face two life sentences based on the charges.

The Petitioner testified that he asked Counsel about the possibility of pleading guilty to facilitation, and Counsel told the Petitioner that the State was not willing to offer a plea agreement for anything other than murder. The Petitioner said that he pled guilty because he "felt like [his] back was against the wall." He did not have confidence in Counsel's representation or preparation for a trial. He stated that, through his petition, he sought to renegotiate his sentence, but the had no intention of going to trial. He further stated that he had never wanted a trial on these charges.

The Petitioner recounted the events leading up to the shooting. He explained that where the parties met was a busy location, so Schamberg drove into a nearby neighborhood. The Petitioner said he was seated in the front seat when Wright and his brother "got into a tussle" in the back seat of the car. Schamberg parked his truck "to see what was going on." The Petitioner said he saw Wright holding a gun and his brother holding Wright's hand down. He said that his brother took the gun from Wright and got out of the car. Schamberg also had a gun, and, ultimately, his brother shot Schamberg.

The Petitioner denied taking any items from the car and denied any knowledge of what happened to Schamberg's gun after the shooting. The Petitioner explained that after his brother shot Schamberg and Wright, they did not have time to stop and take items. They immediately fled the scene. The Petitioner agreed that he "had people following" them and it was in this car that he and his brother fled following the shooting. He maintained that he and his brother did not take money, drugs or a gun following the shooting.

The Petitioner testified that he had also asked Counsel to speak with neighbors who witnessed the shooters fleeing in a blue Malibu. He stated that, because the car was a black Impala and not a blue Malibu, the witnesses identification could be questioned.

The Petitioner testified that he consistently told Counsel that he did not want to go to trial but "wanted to work something out." The Petitioner agreed that, in addition to Counsel's meetings in jail, he also met with Counsel at court appearances. The Petitioner said that his fiancé called Counsel on the Petitioner's behalf, and Counsel would not return her phone calls for "maybe three or four weeks."

The Petitioner testified that he did not clearly understand the implications of his waiver of the right to appeal when he entered the guilty plea. He agreed that the trial court instructed him of this waiver but maintained that he did not understand. He explained that, during the guilty plea submission hearing, he was "just trying to make things go as smooth as possible." He recalled that, before entering the court room for the guilty plea submission hearing, he asked Counsel what would happen if he requested a new attorney. Counsel told him that "it probably wouldn't go." Counsel said that the State might even "take the deal off the table . . . [b]ecause they will think you're playing with them." Based upon this interaction, the Petitioner felt he should "say everything [Counsel] want[ed][him] to say."

The Petitioner testified that when the trial court asked him if he was satisfied with his

attorney's representation, he turned to Counsel and asked if his response would affect his post-conviction "in any kind of way." Counsel responded, "no." The Petitioner stated that this exchange could be heard on the recording of the guilty plea submission hearing.

Counsel testified that, at the time he was appointed to represent the Petitioner, he had practiced law for three years and had not taken a case to trial. He said that this was his first case representing a defendant charged with murder, but he had represented individuals charged with different levels and types of crimes.

Counsel testified that, during his representation, he kept in "regular communication" with the Petitioner's fiancé and mother by telephone. He met with the Petitioner both in court and jail visits. Counsel recalled meeting with the Petitioner twice before the Petitioner was transferred to TDOC and twice while the Petitioner was incarcerated in a TDOC facility. Counsel said he met with the Petitioner "numerous times" at the courthouse but acknowledged that there were several times where the Petitioner was taken "down stairs" before Counsel had an opportunity to meet with him.

Counsel testified that he received discovery in this case and reviewed it with the Petitioner. Counsel said that he also reviewed with the Petitioner the charges against him and possible penalties. Counsel stated that he explained the possible penalty for both the first degree murder of Ryan Wright and the felony murder of Ryan Wright, but his "position" was that the convictions would merge if the Petitioner were convicted of both offenses at a trial.

Counsel testified that, although the Petitioner was "adamant" he did not want a trial in these matters, he discussed trial strategy with the Petitioner. Counsel stated it was a "tough case" against the Petitioner, and he believed the trial would come down to Schamberg's credibility as a witness, who pulled a gun first, and whether a robbery occurred. Counsel explained that, even with the Petitioner's brother's admission, the case against the Petitioner under the theory of criminal responsibility was strong. Counsel said that he explained the theory of criminal responsibility and its application in this case. He said that he believed the Petitioner understood, and he described their communication as "good."

Counsel testified that he did not seek an investigator for trial preparation in this case. He explained that the State's discovery included information regarding Schamberg's criminal activity. He said that because Schamberg freely admitted his involvement with criminal activity, he did not believe there was reason to justify hiring an investigator for this issue. Counsel said that he reviewed witness statements to police and that no one actually saw the individuals get into a car but that one person saw a "blue or black, police looking vehicle" leaving near the scene.

Counsel testified that the Petitioner's mother provided him with the Petitioner's brother's recorded confession. Counsel said that he did not provide this recording to the State because the State was already aware of the admission. Counsel could not recall whether the Petitioner asked him to give it to the State but said that the Petitioner wanted Counsel "to be aware" of the statement.

Counsel testified that the Petitioner appeared to fully understand the plea petition when he reviewed it with the Petitioner. He recalled that the Petitioner asked questions and seemed to understand Counsel's responses to the questions. Counsel said that the Petitioner never indicated he did not want to go forward with the plea agreement and never said anything that led him to believe that the Petitioner did not understand the implications of entering the plea agreement.

Counsel testified that the Petitioner was to be tried jointly with his brother. The Petitioner's brother was represented by an attorney with at least thirty years of experience.

Counsel said that he and this attorney engaged in "some pretty lengthy and full discussions" about the case, various strategies, and the trial.

*White*, 2013 WL 4487607, at *1–6.

## IV.  ISSUES PRESENTED FOR REVIEW

From White's petition, the Court gleans the following grounds for relief:

1. Post-conviction counsel was constitutionally ineffective (ECF No. 1, at 6 (Ground One));

2. Trial counsel was constitutionally ineffective (ECF No. 1, at 12–13, 18–23 (incorporated in petitioner's Grounds One, Two, Three, Four, and Five));

3. The petitioner's sentence violated the Fifth, Sixth, and Fourteenth Amendments under *Blakely v. Washington*, 542 U.S. 961 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (ECF No. 1, at 12, 13 (incorporated in petitioner's Ground One));

4. The sentence exceeded the maximum in the applicable range and is therefore illegal and void (ECF No. 1, at 22 (Ground Four));

5. The conviction was based on an unlawfully induced guilty plea (ECF No. 1, at 15, 29 (incorporated in petitioner's Grounds One and Five));

6. "The Plea Agreement was [d]rafted to receive the Minimum Sentence" (ECF No. 1, at 35 (Ground Six));

7. The prosecutor engaged in prosecutorial misconduct by making statements of personal opinion as to the petitioner's guilt (ECF No. 1, at 37 (Ground Seven)); and

8. The trial court committed errors that violated the petitioner's constitutional rights (ECF No. 1, at 38–39 (Ground Eight)).

The petitioner also argues at length that he is entitled to relief in light of the Supreme Court's decisions in *Martinez v. Ryan*, 566 U.S. ----, 132 S. Ct. 1309, 1318 (2012), and *Trevino v. Thaler*, 569 U.S. ----, 133 S. Ct. 1911 (2013), on the basis of which the Court presumes that he intends to posit the ineffective assistance of post-conviction counsel as cause for the default of some of his claims of ineffective assistance of trial counsel.

## V.  STANDARD OF REVIEW

### A. Defaulted or Unexhausted Claims

A federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once his federal claims have been raised in the highest state court available,[2] the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")).

If, however, an unexhausted claim would be procedurally barred under state law, for instance by a statute of limitations or a state rule barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir.

---

[2] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both "cause" for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental miscarriage of justice." *Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). The "cause" standard in procedural-default cases requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts" to raise a claim in the state courts. *Wogenstahl*, 668 F.3d at 321 (quoting *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (internal quotation marks omitted)). A fundamental miscarriage of justice results when one who is "actually" innocent is convicted. *Gibbs v. United States*, 655 F.3d 473, 477 (6th Cir. 2011).

Until recently, a prisoner could not demonstrate cause by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. *See Coleman*, 501 U.S. at 752–53 (holding that attorney error is not cause to excuse a default). However, in *Martinez v. Ryan*, the Supreme Court held that the ineffective assistance of post-conviction counsel can, under certain circumstances establish "cause" to excuse the procedural default of a defendant's substantial claim of ineffective assistance at trial. 132 S. Ct. at 1315. *See also Trevino*, 133 S. Ct. at 1921 (extending *Martinez* to apply whenever the "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal"); *Sutton v. Carpenter*, 745 F.3d 787, 795–96 (6th Cir. 2014) (holding based on *Martinez* and *Trevino* that the "ineffective assistance of post-conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial").

Under *Martinez*, to establish "cause" to obtain review of an otherwise procedurally defaulted claim, a petitioner must show that (1) he had ineffective assistance of post-conviction counsel during the "initial-review collateral proceeding," *Martinez*, 132 S. Ct. at 1315; *see id.* at 1320 ("The rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings . . . ."); and (2) that the defaulted claim is "substantial," that is, "that the claim has some merit." *Id.* at 1318. In addition, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural

default first articulated by the Supreme Court in *Coleman*, 501 U.S. at 750.

In order to show that he had ineffective assistance during post-conviction proceedings in the first place, the petitioner must satisfy the familiar standard established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). That is, he must show both that his post-conviction counsel's performance was constitutionally deficient and that the petitioner was prejudiced by the deficiency. *Id.* at 687. Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [post-conviction] proceeding would have been different." *Strickland*, 466 U.S. at 694. The Ninth Circuit has recognized some overlap between the *Strickland* prejudice inquiry and the *Coleman/Martinez* "actual prejudice" analysis:

> Within the [*Coleman*] "cause" prong there is an element of "prejudice" that must be established: to show ineffective assistance of post-conviction relief counsel, a petitioner must establish a reasonable probability that the result of the post-conviction proceeding would have been different. The reasonable probability that the result of the post-conviction proceedings would have been different, absent deficient performance by post-conviction counsel, is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective. The prejudice at issue is prejudice at the post-conviction relief level, but if the claim of ineffective assistance of trial counsel is implausible, then there could not be a reasonable probability that the result of post-conviction proceedings would have been different.

*Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014).

In other words, in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of *Coleman*. If not, because the "cause and prejudice" standard is conjunctive rather than disjunctive, the reviewing court would have no need to consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel.

### B.      Standard of Review of Fully Exhausted Claims

Even when a petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254 raises claims that have been properly exhausted in the state courts, this Court's review of the state court's resolution of those issues remains quite limited. First, this Court may "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, a claim asserting only a violation of state law, even if fully exhausted, is not cognizable in federal habeas

corpus. *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Further, under § 2254(d),

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* In other words, a federal court is bound by the state court's adjudication of the petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Further, this Court must presume the correctness of state-court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [this Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (citation omitted).

With respect to the "unreasonable application" clause of § 2254(d)(1), the Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Williams*, 529 U.S. at 409. The Court defined "unreasonable application" as follows:

[A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .

. . . . [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409–11 (emphasis original).

With these principles in mind, the Court will turn to the examination of the claims raised in White's petition for habeas relief.

## VI.    ANALYSIS AND DISCUSSION

### A.    Ground 1: Ineffective Assistance of Post-Conviction Counsel

Insofar as the petition may reasonably be construed to state a claim for relief based upon the ineffective assistance of post-conviction counsel, this claim must be denied. As discussed above, there is no independently recognized constitutional right to the effective assistance of post-conviction counsel. *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and *Murray v. Giarratano*, 492 U.S. 1 (1989)). Because this claim is not cognizable in a habeas corpus proceeding, the petitioner is not entitled to relief on the basis of this claim.

### B.    Ground 2: Ineffective Assistance of Trial Counsel – Exhausted Claims

The petitioner raises numerous separate claims of ineffective assistance of counsel, some of which are exhausted and some of which are not.

The exhausted claims include claims that counsel was ineffective for:

(1) visiting with the petitioner only four times in the course of two years (ECF No. 1, at 29; ECF 13-5 (Post-Conviction Appellate Br.), at 11);

(2) failing to convey a CD with the petitioner's brother's confession to the prosecution or use it to formulate a defense (ECF No. 1, at 29; ECF 13-5, at 11);

(3) never hiring a private investigator or other expert (ECF No. 1, at 29; ECF 13-5, at 11);

(4) not filing a motion to suppress the identification of the petitioner (ECF No. 1, at 29; ECF 13-5, at 11);

(5) failing to develop a cohesive trial strategy (ECF No. 1, at 29; ECF 13-5, at 11); and

(6) failing to ensure that the plea was knowing and voluntary in that counsel misinformed the petitioner that he would be facing two consecutive life sentences if he did not plead guilty (*id.* at 15, 29--30; ECF No. 13-5, at 12).

In *Strickland v. Washington*, as discussed above, the Supreme Court held that in order to claim

successfully that a lawyer's assistance was so ineffective as to violate the Sixth Amendment a defendant must meet two requirements. "First, the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id*. But federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that an earlier state court decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

Thus, when a fully exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, ----, 131 S. Ct. 770, 785 (2011). As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id*. (internal quotation marks and citation omitted).

### *Claims (1)–(3)*

In considering the ineffective-assistance claims that were raised in White's state post-conviction proceedings, the state appellate court articulated the issues as follows: "On appeal, the Petitioner contends that he received the ineffective assistance of counsel. Specifically, he asserts that Counsel failed to: (1) meet with him; (2) fully utilize exculpatory evidence; and (3) hire a private investigator to assist in the defense." *White*, 2013 WL 4487607, at *6. The court then reviewed the post-conviction court's factual findings as to these issues, noting that the appellate court does not

> re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only

when a preponderance of the evidence is contrary to the post-conviction court's factual findings.

*Id.* at *7 (internal citations omitted).

From there, the court correctly articulated and discussed the standard established by *Strickland. White*, 2013 WL 4487607 at *8–9. The court concluded based on the evidence before it that the petitioner had not established that his counsel was ineffective:

> The evidence does not preponderate against the post-conviction court's findings. The Petitioner first alleges that Counsel failed to meet with him. The record shows that Counsel met with the Petitioner four times at his place of incarceration and multiple times during court appearances. During these meetings, Counsel reviewed the discovery with Petitioner and discussed weaknesses in the case. He also discussed the Petitioner's charges and the possible penalties. Counsel also met with the Petitioner, his co-defendant and co-defendant's counsel to discuss possible strategies. The Petitioner has failed to show by clear and convincing evidence that Counsel did not adequately meet with the Petitioner to discuss the case or that he was prejudiced by a lack of consultation between him and Counsel.

> The Petitioner next asserts that Counsel failed to adequately use the Petitioner's codefendant's recorded admission. He fails, however, to state what Counsel should have done with the recording and how that would have benefitted the Petitioner. Counsel acknowledged his receipt of the recording and stated that he did not provide the State with the recording. He explained that he did not do so because the State was aware of the codefendant's admissions, thus, a recording of the admission was unnecessary. Counsel stated that, even with the admission, the Petitioner could still be convicted under the theory of criminal responsibility. The post-conviction court credited Counsel's testimony that he thoroughly reviewed and explained criminal responsibility and its implications in this case. We conclude that the Petitioner has failed to show by clear and convincing evidence that Counsel's performance was deficient or that he was prejudiced by Counsel's failure to provide the State with his co-defendant's recorded admission.

> Finally, the Petitioner contends that Counsel was ineffective for failing to hire an investigator in this case. Counsel testified that he elected not to hire an investigator to investigate Schamberg's criminal activity because Counsel learned through discovery that Schamberg had openly acknowledged his involvement in illegal drug transactions. For this reason, Counsel did not believe an investigator would add anything to the fact that Schamberg was still engaged in criminal activity since the shooting. Counsel reviewed statements from witnesses who were at the scene, and one witness indicated seeing a blue or black vehicle, similar to a police vehicle, leaving the area after the shooting. Based upon this information, Counsel found no need to employ an investigator to assist him in his representation of the Petitioner. The Petitioner has failed to show by clear and convincing evidence that Counsel's failure to employ an investigator was deficient representation or prejudiced the Petitioner.

*Id.* at *9.

The state appellate court reasonably applied the *Strickland* standard to conclude that trial counsel's conduct was not deficient with regard to the number of times he visited with the petitioner, his decision not to provide the CD with the petitioner's brother's confession on it to the prosecution or to use it to formulate a defense, and his decision not to hire a private investigator. The court's determination that the petitioner was

not prejudiced by these decisions was likewise reasonable. The petitioner is not entitled to relief on the basis of the claims that were squarely addressed in the opinion of the Tennessee Court of Criminal Appeals.

### *Claims (4)–(6)*

As indicated above, the petitioner also articulated claims, in both his initial petition and in his post-conviction appellate brief, of ineffective assistance of counsel based on counsel's (1) failure to file a motion to suppress the identification of the petitioner; (2) failure to develop a cohesive trial strategy; and (3) erroneously informing the petitioner he would be facing two consecutive life sentences if he did not plead guilty and generally failing to inform him of all the consequences of entering a guilty plea. The petitioner was also questioned about these issues during the post-conviction hearing. (*See* ECF No. 13-3 (Post-Conviction Hearing Tr.), at 7–9.) The state appellate court, however, did not expressly acknowledge or address these issues.

AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations omitted). This deferential standard is only required when the state court has adjudicated the claim on the merits. "[W]hen a claim has not been adjudicated on the merits in state court proceedings, and has not been procedurally defaulted, [the court must] look at the claim *de novo* rather than through the deferential lens of AEDPA." *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) (internal citations omitted).

In *Harrington v. Richter*, the Supreme Court clarified the meaning of "adjudicated on the merits" under AEDPA. There, the Supreme Court held that, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784–85. This presumption applies even when the state court summarily rejects all of the claims without explaining its reasoning, or rejects a claim on one element without analyzing other elements. *Id.* at 784. The *Harrington* Court reached this conclusion based on the statutory language of § 2254, which requires "adjudication" of a "claim" and not of each component of the claim. *Id.*

The Supreme Court recently extended the *Harrington* presumption of adjudication on the merits to instances where the state court rules against the defendant and issues an opinion that addresses some claims but does not expressly address all the federal claims. *Johnson v. Williams*, 568 U.S. ----, 133 S. Ct. 1088

(2013). The Court recognized that state courts do not always separately address each claim presented in a defendant's papers, even if the state court did adjudicate each claim on its merits. *Id.* at 1094. For example, the state court might conclude that a federal claim is too insubstantial to merit discussion. *Id.* at 1095. Thus, even when the state court does not offer specific analysis of a particular federal claim, the Supreme Court instructs that the "federal habeas court must presume that the federal claim was adjudicated on the merits." *Id.* at 1096. The *Richter* presumption is a "strong" one that may be rebutted by the habeas petitioner only "in unusual circumstances." *Id.* In considering whether the petition has satisfied this burden, the Supreme Court has provided a non-exhaustive list of factors including substantiality of the federal claim. *Johnson*, 133 S. Ct. at 1099–1100 (Scalia, J., concurring).

The petitioner here has not rebutted the *Richter* presumption. Trial counsel testified at the post-conviction hearing that no witnesses identified the petitioner at the scene of the crime; that he had a cohesive trial strategy and discussed it with his client, even though the petitioner was adamant from the beginning that he did not want to go to trial; and that he believed he would have explained to his client that the two murder charges (first-degree premeditated murder and felony murder) would be merged at trial. (*See* ECF No. 13-3 (Post-Conviction Hr'g Tr.) at 45–47, 50–51.) The appellate court summarized that testimony, while also acknowledging the petitioner's contrary statements, and ultimately determined, as the trial court had, that the petitioner had "not shown by clear and convincing evidence that Counsel was ineffective in his representation or that the Petitioner was prejudiced by Counsel's representation." *White*, 2013 WL 4487607, at *10. The court concluded: "After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court." *Id.* The petitioner here has failed to establish that the appellate court's rejection of these claims was contrary to or involved an unreasonable application of the *Strickland* standard, or that it was based on an unreasonable determination of the facts. The petitioner is not entitled to relief on the basis of his claims that counsel was ineffective for failing to file a motion to suppress, failing to develop a cohesive trial strategy, or generally misinforming the petitioner about the nature of the claims against him or the consequences of entering a guilty plea.

C.      **Ground 2: Ineffective Assistance of Trial Counsel – Unexhausted Claims**

The petitioner articulates numerous other claims of ineffective assistance of trial counsel, including

claims that counsel was constitutionally deficient for:

(1) failure to ensure that the sentence established in the plea agreement did not violate *Brady* and *Apprendi* (Grounds One and Five);

(2) ineffective litigation of motions (Ground One);

(3) ineffective litigation of case before trial (Ground One);

(4) failure to ensure that the plea was knowing and voluntary and not induced by duress and intimidation (Grounds One and Five);

(5) failure to require the state to elect which homicide offense it would pursue, prior to entry of the plea (Ground Two);

(6) failure to file motion to suppress evidence seized from the petitioner's residence (Ground Three); and

(7) failure to ensure that the sentence in the plea agreement did not exceed the maximum in the applicable range (Ground Four).

None of these claims were presented in the petitioner's post-conviction appeal. Citing *Martinez v. Ryan*, and *Trevino v. Thaler*, the petitioner asserts that to the extent these claims were procedurally defaulted, the ineffective assistance of his post-conviction counsel constitutes cause to overcome the procedural default.

At least one of these claims, the fourth, was raised in the petitioner's initial-review post-conviction proceedings and considered by the post-conviction court. The post-conviction court rejected this claim, expressly finding that the plea was knowing and voluntary and that it was not unlawfully induced. This claim is defaulted because it was not presented in the post-conviction *appeal*. Although it was defaulted, *Martinez* does not provide cause to overcome the default, because *Martinez* pertains only to the ineffective assistance of counsel during *initial-review* post-conviction proceedings. *Martinez*, 132 S. Ct. at 1315, 1320.

Regarding the remaining claims, the respondent contends that the Supreme Court has not extended *Martinez* to petitioners who pleaded guilty prior to going to trial and that, even if *Martinez* does apply to such claims, those at issue here are not sufficiently "substantial" to merit relief. *See id.* at 1318 (" To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.") Because the Court agrees that none of the claims is sufficiently "substantial" to satisfy *Martinez*, the Court does not reach the question of whether *Martinez* applies to petitioners who pleaded guilty instead of going to trial.

The Court will address the substantiality of each of the defaulted claims listed above, in numerical

order:

1.	In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Four years later, in *Blakely v. Washington*, 542 U.S. 296, 303–04 (2004), the Court clarified that "statutory maximum" "for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" These cases simply have no application where the defendant entered into a plea agreement with a stipulated sentence, and where the trial judge made no factual findings in the sentencing context and instead simply imposed the sentence to which the parties had agreed. Because *Apprendi* and *Blakely* have no application here, counsel could not have been ineffective for failing to object to the sentence based on these cases.

2.	The petitioner does not specify what motions his attorney should have but failed to litigate appropriately, the legal basis for any such motion, or how he was prejudiced by his attorney's failure to pursue such motions. Because he has failed to provide specific information regarding trial counsel's alleged deficiency or how he was prejudiced thereby, the petitioner has not raised a substantial claim that his post-conviction counsel was ineffective for failing to present this argument.

3.	The petitioner contends that his trial counsel provided ineffective litigation of the case before trial. Again, he fails to specify in what way his counsel was ineffective or how he was prejudiced by such deficiencies, as a result of which he has not stated a substantial claim of ineffective assistance of post-conviction counsel.

5.	The petitioner cannot establish that his trial counsel was ineffective because he allegedly failed to require the state to elect, prior to entry of the plea, which homicide offense it would pursue. The petitioner's plea agreement specifies that Count 1 of the indictment, charging felony murder, would be reduced to second-degree murder and that Count 2 of the indictment, charging first-degree premeditated murder, would be dismissed. (ECF No. 13-1 (Plea Pet.), at 11–12.) In addition, the prosecutor and the judge both explained the charges at the plea hearing (Plea Tr. at 2, 5–6, 9–10), and the petitioner testified at the plea hearing that he understood the charges against him and the charges to which he was pleading guilty. (*Id.* at 6, 10.) This claim is frivolous.

6.      The petitioner contends that his attorney should have filed a motion to suppress evidence seized from the petitioner's residence. He argues in support of this assertion only that he had standing to pursue such a motion. He does not identify what evidence was seized from his residence that should have been suppressed, the legal basis for suppression, or how he was prejudiced by the failure to file a motion to suppress such evidence. Because he has not shown that trial counsel was ineffective, his claim that post-conviction counsel was ineffective is not substantial.

7.      Finally, the petitioner insists that his trial attorney's performance was constitutionally deficient insofar as he failed to ensure that the sentence in the plea agreement did not exceed the maximum in the applicable range. He argues that his sentence was illegal. It was not. The sentence was expressly drafted in accordance with *Hicks v. State*, 945 S.W.2d 706, 709 (Tenn. 1997), in which the Tennessee Supreme Court reiterated that "a knowing and voluntary guilty plea waives any irregularity as to offender classification," and therefore, for example, a Range II sentence coupled with Range I release eligibility is valid when the sentence is imposed as a result of a knowing and voluntary plea agreement. The plea in this case was knowing and voluntary, and this claim too lacks substance.

The petitioner is not entitled to relief on the basis of these claims.

**D.      Other Unexhausted Claims**

The remaining claims were not raised in the petitioner's state post-conviction proceedings, either on initial review or in the appeal. This includes the petitioner's free-standing claims that his sentence violated *Blakely* and *Apprendi*; that the sentence exceeded the maximum in the applicable range and is therefore illegal and void; that the conviction is void because it was based on an unlawfully induced guilty plea; that "[t]he Plea Agreement was [d]rafted to receive the Minimum Sentence" (ECF No. 1, at 35); that the prosecutor engaged in prosecutorial misconduct by making statements of personal opinion as to the petitioner's guilt; and that the trial court committed a number of errors, particularly in denying the petitioner's pre-trial motion to suppress, permitting the prosecutor to make statements about his personal beliefs as to the petitioner's guilt and to introduce improper evidence during the plea hearing and the post-conviction hearing, and failed to notify the petitioner that he had the right to withdraw his plea within thirty days after entering it. (ECF No. 1, at 38–39.)

These claims was not presented to the state appellate court, and the petitioner is barred from

presenting them in the state courts now by Tennessee's one-petition rule governing the filing of post-conviction petitions. Tenn. Code Ann. § 40-30-102(c). He does not argue that any of the circumstances enumerated in Tenn. Code Ann. § 40-30-117(a) permits him to re-open his post-conviction petition in the Tennessee courts. The claims are therefore considered to be exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on habeas review unless the petitioner demonstrates both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The petitioner states as "cause" for not raising these issues in his post-conviction appeal that his post-conviction counsel "abandoned" the issues. Insofar as the petitioner believes that the ineffective assistance of his post-conviction counsel provides "cause" under *Martinez* to overcome the procedural default, he is mistaken. As set forth above, under *Martinez*, the ineffective assistance of post-conviction counsel may serve as cause to overcome the default of claims of *ineffective assistance of trial counsel.* The Supreme Court has not extended the holding to apply to any other types of claims.

The petitioner does not argue the existence of any other cause to excuse the default, nor does he contend that the failure to consider these claims will result in a fundamental miscarriage of justice. The petitioner is not entitled to relief on the basis of any of the defaulted claims.

**VII.   CONCLUSION**

For the reasons set forth herein, Derek White's petition under § 2254 will be denied and this matter dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide

reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Under the standard articulated in *Miller-El*, the Court finds that none of the claims raised in White's petition merits further review. A COA will not issue.

An appropriate order is filed herewith.

Todd Campbell
United States District Judge